[Civil No. 3881. Filed November 16, 1937.]

[73 Pac. (2d) 90.]

J. E. REFSNES, SIMS ELY, Jr., and PAUL D. BECK, Copartners, Doing Business Under the Firm Name and Style of REFSNES, ELY, BECK & COMPANY, Appellants, v. ED OGLESBY, Treasurer of Maricopa County, C. WARREN PETERSON, as Chairman, and JOHN A. FOOTE and GEORGE FRYE, as Members of the Board of Supervisors of Maricopa County, and MARICOPA COUNTY, Appellees.

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellants.

Mr. Harry Johnson, County Attorney, and Mr. Mark Wilmer, his Deputy, for Appellees.

LOCKWOOD, J.—This is an appeal by J. E. Refsnes, Sims Ely, Jr., and Paul D. Beck, copartners doing business as Refsnes, Ely, Beck & Company, hereinafter called plaintiffs, from a judgment of the superior court in favor of Ed Oglesby, as treasurer of Maricopa county, C. Warren Peterson, John A. Foote, and George Frye, as members of the board of supervisors of said county, and the county in its corporate capacity, hereinafter called defendants, determining that the latter should not use the proceeds of the 1936–37 taxes to pay a certain warrant of the county owned by defendants and issued and registered during the year 1932–33, until and unless all obligations budgeted and incurred during the year 1936–37 had been satisfied.

The case was submitted to the trial court on an agreed statement of facts, and judgment was rendered in favor of defendants, whereupon this appeal was taken.

The sole question before us is, of course, whether the court properly applied the law to the facts agreed upon, and we state these facts, together with such other facts material to the question of which we may take judicial notice, as follows:

Since the year 1901, sections 775 and 776, Revised Code 1928, have appeared in substantially the same form in our law. These sections read as follows:

"§ 775. *Expense fund; annual budget; duties of treasurer.* The board shall create a fund known as the expense fund, and shall order, whenever necessary, the transfer of sufficient money into said fund from the general fund of such county to pay the expenses of maintaining the government of such county until additional revenues may be collected to defray such expenses. Before making such order the board shall

make an estimate of the amount required, for what purpose, and the amount available for the purposes of such fund, from taxes or otherwise, and when such estimate is made, shall enter the whole of such itemized estimate in the minutes of the board. The county treasurer shall make such transfer when ordered by such board, and pay from such expense fund orders drawn thereon by the board for the maintenance of the county government, such orders to be drawn and signed as county warrants. The board shall not issue an order on such fund until there is sufficient money therein to pay and redeem the order. Orders shall be issued on said fund in the order of their allowance by the board. If at any time the board believes there is more money in said expense fund than necessary to pay the expenses of maintaining the government of such county, it shall make an order directing the treasurer to transfer such excess to the general fund of the county, and the treasurer shall make such transfer so ordered, and the money so re-transferred shall be available for the redemption of outstanding warrants against the county.''

''§ 776. *Expenses defined; transfer of funds.* The expense of maintaining the government consists of official salaries, fees and mileage, fees and mileage of jurors and witnesses, county printing and advertising, books and stationery, feeding county prisoners, the care of the indigent sick, water, wood, lights and like supplies for county institutions, insurance and repairs of county buildings. Boards may create a salary fund and pay therefrom the salaries of officials and employees, and fees and mileage of jurors. After the transfer of funds to the expense fund, the board may transfer from the expense fund to the salary fund, as provided for transfer of funds from the general fund to the expense fund, an amount sufficient to pay such salaries of officials and employees, and fees and mileage of jurors, and authorize and order payments from such salary fund in like manner as on the expense fund, and may, in like manner, create and make payments from such other county funds as necessary for the proper transaction of the business of the county.''

In accordance therewith, for many years it has been the custom of Maricopa county to divide its receipts

among certain special funds established in accordance with the above sections, one of these being known as the "expense fund," and to pay all obligations properly chargeable against any particular fund from the money apportioned to that fund, and no other. If for any reason, an obligation was charged against a certain fund and when it was due there was no money in such fund, it was the custom of the supervisors to follow the provisions of section 867, Revised Code 1928, which reads as follows:

*"Payment of warrants; interest if not paid.* When a warrant of the board of supervisors is presented for payment, the treasurer shall pay the same, and write or stamp on the face thereof 'paid,' the date of payment, and sign his name thereto; if he cannot pay the same for want of funds, he shall endorse thereon, 'not paid for want of funds,' and the date of presentation, and sign his name thereto; and from that time until paid the warrant shall bear six per cent per annum interest, except that school salary warrants may bear not to exceed eight per cent, to be fixed by the county superintendent of schools. He must keep a register of warrants presented for payment."

Whenever, either in the current fiscal year or at later times, the particular fund on which the warrant was drawn was replenished, the warrants drawn against it were paid from such fund in the order of their presentation, regardless of whether the money with which they were paid was the proceeds of taxes for the year in which the warrant was drawn, or came from any other source, including taxes of subsequent years. This the supervisors did, believing they were following the provisions of section 869, Revised Code 1928, which reads as follows:

*"Order of payment of warrants.* Warrants are entitled to preference of payment *out of the money applicable to such warrants* according to the priority of presentment. The treasurer, upon receipt of *money not otherwise appropriated,* shall set apart the same or

·so much thereof as is necessary for the payment of such warrants.'' (Italics ours.)

For many years the legislature of Arizona has been endeavoring to compel the various counties and municipalities to keep their current expenses within their current receipts, and in the year 1921 it adopted what is commonly known as the ''budget law,'' being chapter 52, Regular Session, Fifth Legislature. We shall discuss the principal provisions of this law in a later portion of our opinion. In the fiscal year 1932–33, in an attempt to follow the provisions of that law, the board of supervisors of Maricopa county duly budgeted an amount to take care of the obligation involved in this action, and levied a tax which, if paid in its entirety, would have produced funds with which to meet such obligation and all other obligations budgeted for during that year. But, by reason of the fact that a large amount of the taxes levied to take care of obligations incurred during preceding years had become delinquent and had not been collected, there were many outstanding warrants against the expense fund for expenses incurred in years previous to 1932–33 which had been registered long prior to the one involved herein, and as a result of the custom above referred to of paying warrants drawn on the expense fund in the order of their presentation, regardless of the year in which they had been issued, the expense fund receipts from the taxes for 1932–33 and later years were exhausted after paying such warrants, so that plaintiff's warrant remained unpaid for many years after it was registered. By 1936–37 warrants against the expense fund previously registered had been so greatly reduced that had the supervisors continued the practice of paying warrants of this character in the order of their registration out of the money in the expense fund, regardless of what year's taxes such money represented, plaintiff's warrant would have been satisfied. But the

supervisors, being advised and concluding that they had been in error in their interpretation of the meaning of the statutes in regard to the order in which warrants should be paid, refused to pay any warrants out of the funds collected by taxation during the fiscal year 1936–37, except warrants for obligations budgeted for and incurred during such fiscal year, until and unless all of the expenditures authorized and made for that year had been paid, whereupon this suit was brought to compel the payment of the warrant in question, in accordance with the custom previously followed of paying such warrants in the order of their registration, regardless of whether the money in the expense fund was the proceeds of the taxes for the year in which the warrant was registered or not.

The determination of this case obviously depends upon the correct interpretation of section 869, *supra,* and particularly of the following language contained therein: "out of the money applicable to such warrants" and "money not otherwise appropriated." It is the position of the plaintiff that this language means that any money which may be credited to the expense fund, no matter what its source, falls within both of these above-quoted phrases.

It is the contention of defendants that considering sections 867 and 869, *supra,* in connection with the provisions of the budget law, it clearly appears it was the intent of the legislature that the funds collected by taxation for any one year are applicable solely to the payment of the obligations budgeted for during that particular year until all such obligations are fully satisfied, and that it is only the surplus left from that year's taxes, after paying those obligations, which comes within the language above quoted from section 869, *supra,* as available for the payment of any other obligations. This requires a consideration of the meaning and effect of the budget law. Since apparently it is

*sui generis* in form, though perhaps not in purpose, precedents from other states are of little value.

 We have had this law under consideration in many cases, the first of them being that of *Bank of Lowell* v. *Cox,* 35 Ariz. 403, 279 Pac. 257, 260. After reviewing the history of legislation of this nature, we said:

"These laws varied in form, but the fundamental purpose was the same—*to put county affairs on a cash basis and then to maintain them so* by prohibiting the incurring of any indebtedness in any fiscal year, unless funds had been first provided to meet it." (Italics ours.)

That this was the purpose appears beyond the shadow of a doubt from the entire context of the budget law, but if there were any doubt whatever on the subject, the legislature removed it by the express language of the law itself. In subdivision (c) of 4842-A, which appears in chapter 52, *supra,* the legislature expressly set forth a method whereby deficits of every nature which had accumulated in the county funds up to the adoption of the budget law should be paid, this being by a special levy for that purpose spread over as many succeeding years as the tax commission might think advisable, and then added the following language:

"it being expressly declared the intention that no deficits in the county funds mentioned shall be carried from one fiscal year to another except under the terms and provisions of this Act."

It is true that in the code revision of 1928 (Rev. Code 1928, § 3096 et seq.), subdivision (c), *supra,* was dropped. In the case of *In re Sullivan's Estate,* 38 Ariz. 387, 300 Pac. 193, we have held the presumption was that the meaning of a previously existing law was not changed by the revision of 1928 unless it clearly appeared that such was the intent of the legislature,

and we cannot believe it was the intent of that body, in the revision to emasculate the entire budget law, for such would be the effect of holding that deficits should be carried over from year to year after the revision of 1928. We think it is apparent that the purpose of dropping subdivision (c) was not to change the rule laid down in the language just quoted and thus to defeat utterly the entire purpose of the act, but that the omission was made because the first part of the subdivision in regard to taking care of deficits already incurred up to 1921 had become obsolete by 1928, and the language above quoted was so obviously the intention of the legislature that its repetition was considered unnecessary.

It is a well-known fact, of which we may take judicial notice, that the taxes levied for one fiscal year are never collected 100 per cent. and that there is almost invariably a considerable deficit in all funds at the end of the year. If the unpaid taxes are eventually collected in full, of course the indebtedness will finally be paid. That such collection will be made, however, is beyond the realm of probability if not of possibility. If, then, the indebtedness incurred during a certain year, and not paid therein because of a failure to collect promptly the tax levied to pay it, may be paid out of the collection of taxes levied to meet the budget for a later year, before the indebtedness budgeted for that year is paid, each year necessarily will show an increased deficit, and eventually, in order to clear up that situation, it will be necessary some time to follow the rule laid down by the legislature when the budget law was first adopted, and direct a special levy to take care of the accumulated deficits. Such a construction of the law will create in great degree the very evils the budget law was intended to remedy.

If, however, we hold that the taxes levied for any particular fiscal year can be used only to pay the expenses of that year, unless there be a balance left over, in which case it may be applied to other indebtednesses, one of two situations will arise. Either the county or municipality, realizing that there are unpaid creditors for the previous year, will so cut the expenditures for which they have budgeted for the current year that a sufficient surplus will be left over to pay off the old debts and thus restore the cash basis, or, if it appears that this cannot be done and that the delinquent taxes for the preceding year can never be collected, will apply the rule we have laid down in *Miners' & Merchants' Bank* v. *Herron,* 46 Ariz. 71, 47 Pac. (2d) 430, and make a special levy to take care of the unpaid obligations of the previous year, because of the impossibility of collecting the taxes which were levied to meet those particular obligations. We have held in the case last cited that the duty of the supervisors to levy and collect a sufficient amount of taxes to liquidate bonds is a continuing one and not satisfied until the bonds have actually been paid, and that if, for any reason, it is impossible to collect enough of the tax originally levied to pay them, it is the duty of the supervisors to levy to meet the deficiency. We think in sound reason and common sense the same rule applies to ordinary obligations and indebtednesses of the counties and municipalities. Under the budget law they are not authorized to incur an indebtedness except as budgeted and they must, when the budget is made, levy a tax which, *if collected,* will be sufficient to pay such obligation. If the tax is uncollectible for any reason, the only way in which the obligation can be taken care of is by another levy to make up the deficit, and this is the course which should be followed by such counties and municipalities.

504

 We hold therefore that, construing the budget law in connection with sections 867 and 869, *supra,* the only money applicable to the payment of registered warrants is the proceeds of the taxes levied for the express purpose of meeting the budget obligations which those warrants represent, together with any surpluses left over from the taxes levied to meet the budget of any other year, after the obligations incurred thereunder have been fully paid, and such other receipts of the county as are not raised by taxation and are not appropriated to another legal purpose. It appearing from the agreed statements of facts, and those of which we have judicial knowledge, that the obligations incurred under the Maricopa county budget for 1936–37 have not yet been fully satisfied, it is the duty of the defendants not to use the proceeds of the taxes for that year for any other purpose than the payment of the obligations of the same year, until such latter obligations are fully paid.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.